Next matter, number 181160, Rachel Doucette et al. versus the Georgetown Public Schools et al. Good morning, counsel. Good morning. May it please the court, my name is Carol Kelly and I represent the plaintiff appellants, the Doucettes. If I may, I'd like to reserve two minutes for rebuttal. The plaintiffs are before this court seeking reversal of the dismissal of their claims under Section 1983 and the Rehab Act, Section 504, and the dismissal was based on a failure, what the court determined to be a failure to exhaust administrative remedies under the Individuals with Disabilities in Education Act. It's the plaintiff's position that in this case the court should reverse the dismissal first because the Section 504 claim is not a claim subject to the exhaustion requirements. Counsel, let me just get a sense of chronology here, which I think may be important to how we analyze your contentions. I gather that in 2010 there was, you were going through an administrative hearing process and that resulted in the formulation of an IEP and then it appears that the IEP did not play out as you hoped it would and the child experienced a history of seizures and as a consequence of that he's gone to an, he went to an out of school placement and remains there. It would appear that it's because of the, from your point of view, the failure to implement the IEP properly that he experienced these medical events which are the cause, you allege, of the damages that he experienced and that why doesn't it follow from that that the IEP and the failure to implement it properly is central to your Rehabilitation Act and your substantive due process claims. How can we avoid the conclusion that however you style your claims that the gravamen, the substance, does involve the implementation of the IEP? Admittedly, Your Honor, there are allegations in the complaint that the town failed to comply with the requirements of the IEP and how they carried it out. Those allegations are all through the complaint? Certainly, but that's not dispositive of the Section 504 complaint for this reason. Well, go ahead, answer the question. For this reason, it's a separate allegation and the United States Supreme Court recently in FI said that what you have to do when you're faced with one of these situations is you do a claim-by-claim analysis and you do that so that the non-IDA-based claims, the non-FAPE claims, are not swept up with claims that would otherwise not be subject to the exhaustion requirement. And our position is if you apply the test as suggested by the U.S. Supreme Court in FI that in this case, with respect to the denial of the service dog, that claim survives because it didn't need to be exhausted. Because first, if another student in the school who wasn't under an IEP was denied access to his or her service dog in violation of Section 504, that student would not be required to go through an administrative process before accessing the court. Secondly, if this took place in a different setting, say a library, if the student was denied access to his or her service dog under those circumstances, administrative exhaustion isn't required. So when you do that analysis, you can carve out that 504 claim as separate from the overall problem of there not being a proper implementation of the IEP. But the Supreme Court's preference, if they have one, and I'm not so sure that's clear from their opinion, but it certainly has been taken up in that light by a couple of the circuits, the preference for a claim-by-claim analysis doesn't nullify the allegations of the complaint as a whole, because even in a claim-by-claim analysis, those allegations have to inform the claim, because otherwise, simply by actful pleading, you could entirely avoid the reach of the IDEA exhaustion requirement. And here, the Rehabilitation Act claim, as I understand it from the complaint, isn't the denial of a service dog, it's the denial of the service dog under the IEP. That's the way the complaint has tied these together. I would think that you could plead in a proper case a service dog denial that would be independent of the IDEA. I'm just not certain you've done it here. Our position, I believe, Your Honor, we've pled it separately. We've said that the section 504 violation existed, and we haven't engaged in actful pleading. We didn't make an effort to avoid any reference to IEP or the child's status as having separate needs. We have other claims that are tied to those, but with respect to... But you did allege that the IEP should have included an accommodation for the service dog. Yes, Your Honor, but we also... And you charged in your complaint that the school district, by denying that, that that was one of the bases under the Rehabilitation Act on which they became liable to the plaintiffs. One of the bases, yes, Your Honor. However, regardless of whether it was included or not included in the IEP, that child was entitled to have that service dog and not be precluded inappropriately by the town from having it be present. And I think it's also important to point out that in the Fry case, the Supreme Court said that they were going to leave for another day whether exhaustion is required when the specific remedy, namely damages for emotional distress, is not one that an IDEA hearing officer may award. Yeah, the Supreme Court did say that, but I think that the more pertinent question for present purposes is whether or not that question is foreclosed in this circuit because of our decision in Fraser and Fairhaven School District. Yes, Your Honor, and I understand that your authorship of that decision emphasized the importance of the administrative process in cases in which the propriety of a town's actions in carrying out its educational obligations to students with special needs is implicated. With respect to the 504 claim here, we suggest that it doesn't require that analysis. This child, whether or not he had an IEP, had an entitlement to that dog. He was not permitted to that. The 504B claim shouldn't be considered an IDEA claim, and therefore, Fraser doesn't apply. But if the 504B claim shouldn't be considered an IDEA claim, if that's not the gravamen of the action, then we don't have to consider Fraser at all because then you're out from under Fry. But the fact remains that if, and this is wide open, if we were to determine that the 504B claim was within what Fry considers an IDEA-related claim so as to require triggering the administrative process, Fraser then applies foursquare. Yes, Fraser applies, Your Honor, under those circumstances. However, Fraser expressly acknowledges that there may be circumstances in which exhaustion isn't required, and that's the futility argument. And our position... Let me ask you, Fraser talks about the importance of hearing from educators who can inform how an IEP plays out or how it did not work. I mean, I get the sense that what you're now talking about, these damages issues, are arguably medical issues which perhaps educators can't really say much about. I mean, are you in effect contending that what we're now dealing with is a medical causation case which requires medical experts and not educational experts? Precisely, Your Honor, and that's what we pointed out in our brief. That is why the administrative process wouldn't be a benefit to going forward on the 504 claim. This is a question of whether, given this child's fragile status, his serious needs, the need for his service dog in relation to his potential exposure to a seizure condition which could be life-threatening, that all of those things came into play, the denial of the service dog resulted in, on that day, the first day he showed up for class, under those circumstances, he had his first ever life-threatening tonic-clonic seizure. He proceeded to have more, but at that point, so the question that the burden we would bear would be to show on our damage claim that the present with this child resulted in that medical condition evolving and developing. That would be our burden. It has nothing to do with whether his IEP was appropriate. And what had happened here was the IEP that was agreed upon was continuing in force in effect. Yes, the parents, in an effort to try to do what was right for their son, to get him the best possible sort of services, would want it to be in the IEP, but they didn't need to have it in the IEP. He had a right to have that dog with him because he had the medical necessity for it. He had the appropriate certification. The town precluded it. They wanted the parents to, for example, assume liability for anything that happened to the dog. They had requirements for handlers that wouldn't have been in place for someone without an IEP. So they treated him differently than a student would have been treated who was in the general population. So if you were required to go through an administrative process, is it your position that there would be no point to calling medical experts as part of that administrative process? It would be because at that hearing, the question is what services did the child require? What services did the child require in the past? If you're not talking about amending the IEP, if you're talking about a claim for monetary damages under Section 504 based on the deprivation of the dog, independent of any IDEA FAPE issues, then the hearing officer would have no ability to address something because that's not education-based relief. And so it puts it outside of the FAPE cases. It puts it outside of Fraser where the concern was that a parent could wait until the child had graduated and then move for, seek damages based on the denial of educational services. And the court there said, well, that doesn't make sense because that child would be entitled to some sort of compensatory damages. But in relation to educational services, not personal injury resulting from a wrongful deprivation of this service dog under Section 504. Well, but here the administrative process ended in 2010. You became dissatisfied with the way that was being implemented, particularly in light of the medical problems that the child experienced. You could have renewed the administrative process at that time to address deficiencies that you felt in the implementation of the IEP. That was an option available to you, was it not? Potentially, yes. However, what's important to bear in mind is that as of the end of this period when the seizures took place, all of the offending conduct had ended. The child was then removed from the school system. So we're talking about playing for retrospective damages, retrospective harm. The placement in the out-of-state district had already been made. I see my time is up. So you were satisfied at that point? At that point, yes. Yes. Good morning. May it please the Court, Alexandra Hassel for the Town of Georgetown, Georgetown Public Schools, Georgetown School Committee, Carol Jacobs, Margaret Maher, Kathleen Estep, and Donna Strait. And we request that this Honorable Court uphold the District Court's decision to dismiss the parents' federal claims brought pursuant to Section 504 and Section 1983 for failure to exhaust their administrative remedies. To hold otherwise, as these claims have been pled, would allow the parents to put the cart before the horse, so to speak. And that is because... Well, but doesn't that argument itself, put the cart before the horse? You're assuming that the claims, and counsel has talked specifically and only so far about the 504B claim, is not sufficiently, is sufficiently IDEA related that the exhaustion requirement should be applied under the teachings of Frye. So isn't that the first question we have to determine, is whether or not that claim should be allowed to go forward without exhaustion because it can stand independent of the IDEA. That is, that the gravamen of the claim is not the IDEA, is not the territory fenced in by the IDEA. Yes, Your Honor. And I think here that this matter is distinct from Frye, in that in Frye, while it did involve a service dog, there was no, there were no allegations in the complaint that there had been a denial of fate when the service dog was denied. And so here, I think that the claim does not, the 504 claim does not stand alone. As drafted... What would exhaustion look like in this particular case? Because by the time he was moved out of that summer program to another school, they were satisfied, and he had his dog, and they were satisfied with his educational plan at that point, and the town had agreed to pay for it. So what would they have taken to one of these hearing officers at that point to exhaust? Well, I think the issues with the service dog specifically started in 2000, early 2012, when the school committee was attempting to work with the parents and attempting to develop a policy that the parents were not pleased with. And I think at that time, that could have been an appropriate time to take their grievance to the BSEA to have that remedied and addressed. Instead... I'm sorry, hadn't the injuries to the child already happened? The seizures had already happened, isn't that correct? No, I believe that it was in the spring that the early, I think early 2012, when the parents requested that the service dog be allowed to attend school with B.D. throughout the spring. So this was before the seizures? That's correct. And then in the spring of 2012, the school committee had tried to put together a policy in regard to the handler. The parents were not satisfied with that policy and opted not to agree to it, not to sign it. And so that was before the summer program of 2012, before his first seizure, which was July 5th of 2012. But Judge Thompson's question, as I understood it, was if we said today that there had to be an exhaustion hearing, what would that hearing look like? What would the hearing officer be asked to examine or to report on? What witnesses would he hear and to what end? And just to follow up, part of the theory of exhaustion is that helpful information comes out during these proceedings that will help a court analyze whether an appropriate decision has been made. And I can't figure out what that would look like in this case, since it's all going to be medical. Well, I think what it would look like is at the time that these grievances were occurring, did there need to be an amendment to the IEP for the service dog as requested by the parents? Were they implementing the IEP that was in place at the time? Because it's these claims that he was not receiving the proper services that the school was... So are you saying that the hearing officer would be making proximate cause determinations? I still don't understand what that would look like. Well, I think it's the expert opinions of those at the BSEA that would be able to determine and give the court, a reviewing court, guidance as to whether the district was in compliance with the IDEA. In other words, the hearing officer would inquire into whether the school, when the service dog amendment to the IEP was in accordance with its obligation to provide an FAPE? That's correct. Okay. Counsel, I'm wondering if... I mean, there is an alternative argument that the appellants are putting forth to the effect that, okay, even if on the type of fry analysis, the grovelment of the complaint really falls within IDEA, nevertheless, there are exceptions for exhaustion, one being futility, which there they talk about you can't get damages, that doesn't work. But they also talk about the exception that's unduly burdensome, and I guess by that they mean the process would not address the medical issues that are at the heart of the complaint. Why should they go through an administrative process when it can't, in any useful way, address the medical causation issue that's the heart of the case? So how do you respond to that unduly burdensome point that I think they're making? Yes. And on that point, I think it's the way that the complaint is pled, the causation for the medical issues is directly related to the district's alleged failure to provide DD with appropriate services with a FAPE, with the service dog. And so I think that exhaustion would not have been overly burdensome when really the basis of these medical, unfortunate medical circumstances that occurred is the denial of FAPE. I keep also coming back to Judge Thompson's question, what would be the point of the administrative process at this point? I guess in 2014, they reached a satisfactory agreement on the out of school placement, there's no complaint about this. This is all, what could, I think of the administrative process, it's intended to try to reach a mutually satisfactory solution. What is an appropriate IEP? That's largely what it's about. That's not what's at issue anymore. Everybody is satisfied with the child's placement now. This is about what happened in the past, what caused these medical incidents. Yes, they may have something to do with deficiencies in the IEP, but they're not trying to get a new IEP now, they're trying to be made whole for some damages that they and their child experience. How does a renewed administrative process address that at all? Well, I think that's the problem with this case, is the timing, in that had the administrative process been utilized at an appropriate time rather than years, rather than... So you see this as a kind of evasion situation that we worried about in Fraser, is that how you see it? That's correct. I think that it's very problematic, and that in a case like this, yes, there was a settlement breached between the parties. But in other cases, that going forward, that might not be the case. And so it allows plaintiffs going forward to circumvent the BSEA processes and just say, well, then I'm going to go right to court, or wait it out, not address them, not address my issues with the adequacy of the fate being provided to the child, and go right to court. They didn't do that here. I'm sorry? They didn't do that here. They tried to work with the school system to reach an accommodation for the child. And that has worked out, except it took two years. And so in that time, I think that it... But the specific service dog request, was it made at the beginning of the two-year period? It was made prior to the two-year period. They first started trying to incorporate the service dog into BD's school day in early 2012, which is why the school committee was developing, attempting to develop a policy for the handler. And they allowed the service dog at what point? I believe it was after the first seizure. That was in 2012, wasn't it? It was. It was the summer of 2012. They're complaining about the dog. What I'm saying, the whole dog issue got resolved relatively quickly once the child's condition deteriorated. That's correct. But I think when the claims are being based on the fact that the dog was denied, that the IEP was not amended because it was, the dog was allowed to come to school with him. But... There wasn't a two-year period. It happened in 2012, not in 2010. That's correct. I was talking about the two-year period between 2012 and 2014, when they came to the settlement agreement. But the child had moved at that point, right? He had been, he was unilaterally removed on September 5th from the district. 2012. In 2012, that's correct. That's correct. So it was a settlement, but from the parents' perspective, it was a satisfactory resolution within a limited amount of time. That, I would concede that, but I think that it is problematic that the administrative remedies were not exhausted as they arose, and as such, when the claims are based entirely on these injuries occurred because you didn't... Give me the specific time frame that you are saying the administrative remedies were not exhausted. I would say beginning as early... Well, even after 2010, after the initial settlement agreement in 2011 and in 2012, the parents were not satisfied with programs. They were not satisfied with whether BD was receiving the programs he was supposed to, whether specific individuals were appropriately trained to provide him with the services required, whether he was entitled to have the service dog, whether the placement was appropriate, the ES, the extended school year for 2012. And so these were, these did not just start in 2012. There has been a, unfortunately, a long history regarding BD's fate. But their 504 claim is based on the denial of a service dog, which they say any similarly situated person who wasn't going through the IED process would have been allowed to have. And I think that it's not that, I think that it's anyone who needed to bring a service animal, whether they have an IEP or not, into a school environment would need to have some sort of a permission from the district to do so. Additionally, I think that it could have been very beneficial to the court to have some sort of a record as to whether BD was actually denied access to the FAPE that was to be provided to him by the failure to provide this reasonable accommodation, whether he needed it for, to receive a FAPE. And we don't have a record as to whether that's the case. And so in terms of the 1983 claim, I don't think that it can be determined that the gravamen of those claims is not a denial of FAPE. In fact, it expressly states so on page 35 of the record where it says BD was denied a FAPE. And so I would ask that this court uphold the district court's decision. Very briefly, Your Honors, this isn't a situation where the parents sat back and waited to file a claim for damages knowing that they had the right to seek relief before the time that they did so. They brought the claim after their child had been injured. The child got the service dog in the late fall of 2011. Discussions took place with respect to how he would be included in the child's school day subsequently. While those things were being worked out, the town took the position that the child could not bring that dog into school without the parents agreeing to terms that were inconsistent with his rights under Section 504, including, as I referenced earlier, a requirement that the parents sign an assumption of liability for any harm caused by the dog, as well as any if the dog ruined a carpet. Those things were inconsistent with his rights under Section 504. The parents didn't want to comply with that request for permission, some sort of a permission, and that was within their rights. With respect to the futility argument, I appreciate and understand and certainly don't suggest in any way that Frazier should be overruled or that it should somehow be altered to expand the scope of claims that aren't subject to exhaustion beyond the very limited proposal that we're putting forward today. And I respectfully request that the court give consideration to the rationale of the case. In the 10th Circuit courts, in the cases cited in our brief, the 7th Circuit in the McCormick case found futility where the plaintiff's claim was for permanent damage to his body caused by the defendant's conduct that could not be redressed by the IDEA. And in the 10th Circuit, the Padilla court decided under the narrow circumstances presented there, an ADA violation resulting in a fractured skull. In that case, the court said, and I quote, we fail to see how IDEA's administrative remedies oriented to providing prospective educational benefits could begin to assage plaintiff's severe physical and completely non-educational injuries. Counsel, you seem to distinguish between futility and unduly burdensome. Am I correct that you are drawing a distinction between the two? And if so, I would like you to articulate as succinctly as you can in what way having to go through the administrative process would be unduly burdensome to your client. I think the unduly burden is tied to expense. It costs tens of thousands of dollars to go through an IDEA process. But I think it also, the burden would be that the plaintiff would be required to prepare for, obtain experts, and prove a case, try to prove a case at the IDEA that has no bearing on the separate, distinct, legal, factual, medical causation issues that the 504 claim would require them to prove in this federal court. And what would come out of such an administrative process at this point that could affect in the cases that the child was receiving in the school district? It would have no relationship to that at all. Nothing would come out of it. That's correct, Your Honor. Thank you.